DISTRICT OF OREGON
FILED
October 28, 2011
Clerk, U.S. Bankruptcy Court

Below is an Opinion of the Court.

ELIZABETH PERRIS
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>CASCADE GRAIN PRODUCTS, LLC,<br><br>Debtor. | Bankruptcy Case No. 09-30508-elp7 |
| PETER C. MCKITTRICK, Trustee,<br><br>Plaintiff,<br><br>v.<br><br>GAVILON, LLC, f/k/a ConAgra Trade Group, Inc.; and GAVILON GRAIN, LLC, d/b/a Peavey Grain,<br><br>Defendants. | Adversary No. 11-3038<br><br>MEMORANDUM OPINION |

Plaintiff, the trustee in this Chapter 7[1] bankruptcy case, filed this complaint to recover as preferential transfers $19,885,728.12 that

[1] All chapter and section references in this Memorandum Opinion are to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

debtor Cascade Grain Products, LLC ("debtor"), paid to defendants[2] within 90 days before bankruptcy. Defendants move for summary judgment, arguing that all transfers were settlement payments on account of forward contracts and therefore not subject to recovery as preferences under § 546(e).[3]

FACTS

Before it filed bankruptcy, debtor, an ethanol producer, entered into a number of contracts with defendants for the shipment of corn to be used in the production of ethanol. Pursuant to those contracts, defendants shipped corn to debtor and issued invoices, which debtor paid. Overpayments and underpayments were netted out. Within the 90 days before bankruptcy, debtor made payments to defendants totaling $19,885,728.12.

The contracts called for shipment within a window of time. In four of the contracts, the shipment window commenced on the same date as the date of the contract. Each of those four contracts included a delivery term of "Del PNW," which the parties agree means that the contracts are "delivered contracts" as that term is used in the National

---

[2] Defendants argue that debtor's contracts at issue in this proceeding were with defendant Gavilon Grain, LLC, not Gavilon, LLC. Because I conclude that defendants are entitled to summary judgment on their forward contract theory, I need not address the issue of whether Gavilon, LLC is properly a defendant in this proceeding. My reference in this Memorandum Opinion to defendants in the plural is not intended to indicate any conclusion with regard to Gavilon, LLC.

[3] Defendants also argue that one of the transfers at issue was actually a prepayment and that defendants gave new value after the payments were made. I understand that the prepayment issue has been resolved. Because I agree with defendants about their forward contract defense, I need not address the new value defense.

Feed and Grain Association's Rule 6.

The trustee seeks to recover the payments made within 90 days before bankruptcy as preferences pursuant to § 547(b).

Defendants do not dispute that the payments fit the requirements for a preferential transfer under § 547(b).[4] They argue, however, that they are entitled to summary judgment because they have a complete defense to recovery of the transfers under § 546(e).

DISCUSSION

The court shall grant summary judgment if there are no genuine disputes about material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a). There are no disputes about material facts, therefore the question here is whether defendants are entitled to judgment as a matter of law.

Section 546(e) provides, as relevant, that the trustee may not avoid a transfer if it is a settlement payment made to a forward contract merchant in connection with a forward contract. The trustee does not dispute that the payments were settlement payments, that defendants are forward contract merchants, or that a number of the contracts were forward contracts. He does, however, dispute that four of the contracts

---

[4] Section 547(b) allows a trustee to avoid as a preference any transfer of an interest of the debtor in property within 90 days before bankruptcy if it was to or for the benefit of a creditor on account of an antecedent debt, made while the debtor was insolvent, and that enabled the creditor to receive more than it would have received in a chapter 7 case had the transfer not been made.

were forward contracts that are protected by § 546(e).[5]

The Bankruptcy Code defines a "forward contract" as

> a contract . . . for the purchase, sale, or transfer of a commodity, . . . with a maturity date more than two days after the date the contract is entered into[.]

§ 101(25)(A) (emphasis supplied). The trustee argues that the contracts at issue had a maturity date that is less than two days after the contract was entered into, and so are not forward contracts protected by § 546(e). He calculates the total payments made on those contracts to equal $10,543,628.72.

The trustee's argument is based on the fact that each of the contracts at issue provides for shipment of corn within a window of time commencing on the same date as the date of the contract. For example, Contract No. 57234 is dated October 24, 2008, and calls for shipment of corn between October 24, 2008 and October 31, 2008. Because the shipment window commenced on the same date as the contracts, the trustee argues

---

[5] Although the trustee said in his brief that there are five contracts, he identifies only four: 57234 (McKittrick Declaration, Exh. 1), 57285 (McKittrick Declaration, Exh. 4), 57302 (McKittrick Declaration, Exh. 5), and 57355 (McKittrick Declaration, Exh. 8). In footnote 6 of the trustee's brief, he says that defendants have not identified to which contract the January 23, 2009, payment of $101,486.07 refers, and so it may refer to a non-forward contract.

At the hearing on this motion, the parties advised the court that they believe the $101,486 payment was either a repayment for ethanol or a repayment for an earlier refund. In any event, defendants clarified that this payment is not included in their summary judgment motion.

Because the trustee does not dispute that the contracts other than the four in dispute are forward contracts, the payments made on account of those contracts are not recoverable as preferences, and defendants are entitled to summary judgment as to those payments.

that the contracts matured less than two days after the contracts were entered into and therefore are not forward contracts. In other words, he views "maturity" as the date on which defendants' performance could commence.

Defendants argue that the date of maturity is not the first date in the window for shipment, but instead is the last date on which performance can occur under the contract.[6] The question is not, they argue, whether the contract could be performed within two days of the contract date, but instead whether performance is due within two days of the contract date.

The dispute distills to what is meant by "maturity date" in § 101(25)(A). Although the Bankruptcy Code defines "forward contract," it does so in part by using the term "maturity date," which it does not define.

In determining the meaning of "maturity date" as used in the definition of "forward contract" in § 101(25)(A), the court will look at the ordinary meaning of the term. See Ransom v. FIA Card Servs., N.A., 131 S.Ct. 716, 724 (2011). In the context of commercial law, the date of maturity is "[t]he date when a debt falls due, such as a debt on a promissory note or bond." Black's Law Dictionary 452 (9th ed. 2009). An obligation is "due" when it is "[i]mmediately enforceable" or "[o]wing and payable." Id. at 574.

---

[6] Defendants argue that it is the last date on which delivery can be made under the contracts. However, the contracts do not actually provide any delivery dates. They provide for dates of shipment. I understand their argument to be that the contracts do not mature until the last date for performance.

Courts that have looked at the question of "maturity date" for purposes of § 546(e) and § 101(25)(A) have come to different conclusions about the meaning of the term. In In re Mirant Corp., 310 B.R. 548, 565 n.26 (Bankr. N.D. Tex. 2004), for example, the court said that "[t]he term 'maturity' suggests a single date." It concluded, however, "that 'maturity' means the due date for commencement of performance[,]" rejecting the Black's Law Dictionary definition because it defines the term "solely in terms of a promissory note." Id. Looking to the legislative history of § 101(25), the court noted that Congress contemplated a series of transactions, thereby supporting its conclusion that there could be numerous maturity dates, or due dates for commencement of performance, for a single contract.

The most recent case to have addressed the issue is In re Renew Energy LLC, 2011 WL 3793157 (Bankr. W.D. Wis. Aug. 24, 2011), which was a preference action to recover payments made by an ethanol plant to a natural gas company. The payments related to three contracts, each of which, as in this case, provided a window of time for performance. The court noted that no court had, as yet, explicitly defined "maturity date." Id. at *4. It rejected reliance on cases, such as Lightfoot v. MXenergy, Inc., 2011 WL 1899764, *4 (E.D. La. May 19, 2011), that say that the date of the first delivery is the maturity date, because in Lightfoot there was no dispute that the first date of delivery was outside the two-day period. "In the absence of any helpful definition in the Bankruptcy Code or the Uniform Commercial Code," the court said, the common sense or usage

definition of "maturity date" is the date that all other obligations

> under the contract have been performed, and nothing else need be done except tender payment. Common usage in the context of forward contracts suggests that it refers to the date on which delivery has occurred and payment to "settle" is due. The word "mature," used in § 101(25A), suggests a single date and meant [sic] the "due date for commencement of performance," but Congress did not intend to restrict the number of times a forward contract can mature.

Renew Energy, at *4.

In Renew Energy, the court looked at the actual delivery dates, and concluded that the contract under which delivery was actually made within two days of contracting was not a forward contract within the safe harbor of § 546(e).

In support of his argument that "maturity date" means the date on which performance could commence, the trustee relies on cases that say that a forward contract must require delivery more than two days after the date of the contract. See, e.g., In re Nat'l Gas Distribs., LLC, 556 F.3d 247 (4th Cir. 2009); In re MBS Mgmt. Servs., Inc., 432 B.R. 570 (Bankr. E.D. La. 2010), aff'd, 2011 WL 1899764 (E.D. La. May 19, 2011); In re Borden Chemicals and Plastics Operating Ltd. P'ship, 336 B.R. 214 (Bankr. D. Del. 2006); Mirant Corp., 310 B.R. 548. Those authorities are not helpful, because in those cases there was no dispute that the initial delivery was due more than two days after the contract was entered into.

Therefore, I am not convinced by the trustee's authorities that "maturity date" means the earliest date on which performance may occur, in other words, that the seller could (but was not required to) perform within two days of the contract. Because the ordinary meaning of the term does not help in determining whether the contracts at issue here are forward contracts, I turn to the purpose behind the safe harbor provision, which is to protect the financial markets "from the

destabilizing effects of bankruptcy proceedings for parties to specified commodities and financial contracts[.]" Nat'l Gas Distribs., 556 F.3d at 252. Relying on the legislative history, the court in Nat'l Gas Distribs. recognized that Congress was concerned that, "[b]ecause financial markets can change significantly in a matter of days, or even hours, a non-bankrupt party to ongoing securities and other financial transactions could face heavy losses unless the transactions are resolved promptly and with finality." Id. at 253 (quoting H.R. Rep. No. 101-484, at 2 (1990)).

> The primary purpose of a forward contract is to hedge against possible fluctuations in the price of a commodity. This purpose is financial and risk-shifting in nature, as opposed to the primary purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the commodity.

H.R. Rep. No. 101-484, at 3 (1990).

Given that Congress sought to protect payments under the type of price-hedging contracts that are known in the financial markets as forward contracts, the interpretation of "maturity date" as used in the definition of forward contracts in the Bankruptcy Code should conform with the usage of the term in the financial markets.

The common meaning of "forward contract" is "'a privately negotiated investment contract in which a buyer commits to purchase something (as a quantity of a commodity, security, or currency) at a predetermined price on a set future date.'" Nat'l Gas Distribs., 556 F.3d at 260 (quoting Merriam-Webster's Dictionary of Law (contract)).

> [A] forward commodity contract, in being "forward," must require a payment for the commodity at a price fixed at the time of contracting for delivery more than two days after the date the contract is entered into. A maturity date in the future means that the benefit or detriment from the contract depends on future

fluctuations in the market price of the commodity.

Id. (citations omitted).

The term "maturity date" is variously described in the financial markets as "[t]he future date at which the commodity must be bought or sold[,]" www.oneview.mercer.ie/pages/1390620 (last visited on Oct. 27, 2011); or the "[p]eriod within which a futures contract can be settled by delivery of the actual commodity," www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary_f.html (last visited on Oct. 26, 2011).[7] One of the defining characteristics of forward contracts in the financial markets is that they are hedges against fluctuations in the price of commodities, in that they are contracts for a set price for delivery sometime in the future. See Commodity Futures Trading Comm'n v. Erskine, 512 F.3d 309, 324-25 (6th Cir. 2008) (compiling definitions of "forward contract" from industry sources).

In light of the hedging component of forward contracts, I conclude that "maturity date," as used in the definition of "forward contract" in § 101(25), means the future date at which the commodity must be bought or sold. That is the date on which the benefit or detriment will be realized, depending on the market price, which is the date when ownership and risk of loss passes to the buyer. That is the date on which the buyer's obligation to pay matures, locking in the benefit or detriment of

---

[7] The difference between futures contracts and forward contracts is that futures contracts are standardized and traded on the exchange. Forward contracts are individualized, private contracts. The two types of contracts have the same function: to "allow people to buy or sell a specific type of asset at a specific time at a given price." www.investopedia.com/ask/answers/06/forwardsandfutures.asp#axzz1c5wP4yJg (last visited on Oct. 28, 2011).

the contract.

The contracts in this case did not call for delivery on any particular date; they called for shipments within particular windows of time. The contracts at issue used the delivery term “Del PNW,” which the parties agree means that they were “delivered contracts” as that term is used in the National Feed and Grain Association’s Rule 6. Rule 6 provides that, for delivered contracts transported by rail, title and the risk of loss pass to the buyer “when the conveyance is constructively placed or otherwise made available at the Buyer’s original destination.” www.ngfa.org/files//misc/2011_Grain_Trade_Rules_for_web.pdf (last visited Oct. 23, 2011).

Only one of the shipments for which the disputed payments were made was made within two days of the contract. None of the shipments was delivered within two days of the date of the contract. Ownership and risk of loss did not pass to debtor until delivery was made. Therefore, none of the contracts matured within two days of the contract.

I conclude that the four contracts at issue were forward contracts, because the dates on which debtor received the corn, giving rise to its obligation to pay, was more than two days after the dates of the contracts. Although shipments could have been made within two days after the contracts were entered into, no deliveries actually occurred within two days of the contract dates. These contracts are similar in every way to the other contracts between debtor and defendants, which the trustee concedes were forward contracts, except for the fact that the period during which shipment could occur commenced on the date of the contracts.

CONCLUSION

The contracts did not mature until delivery was made, which was more than two days after the date of the contracts. Therefore, the contracts were forward contracts, and § 546(e) precludes the trustee from avoiding the payments made to settle those contracts. Defendants are entitled to summary judgment as to all of the payments included in the complaint except for the one payment of $101,486.07, made on January 23, 2009, which defendants did not include in their motion for summary judgment.

Mr. Conway should prepare and submit the order.

###

cc: Timothy J. Conway
Trish A. Walsh